**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**THOMAS G. KROCHTA**
Evansville, Indiana

**ERIN L. BERGER**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENTAL RIGHTS OF: | ) ) ) | |
| A.W., N.W., P.W., M.W., & C.H. (Minor Children), | ) ) ) | |
| M.H. (Mother) & M.W. (Father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 82A04-1302-JT-99 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
Cause No. 82D01-1208-JT-81; 82D01-1208-JT-82;
82D01-1208-JT-83; 82D01-1208-JT-84; & 82D01-1209-JT-97

**October 15, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellants-Respondents, M.H. (Mother) and M.W. (Father) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their five minor children, A.W., N.W., P.W., M.W., and C.H. (Child or Children).

We affirm.

ISSUE

The Parents raise one issue on appeal, which we restate as: Whether the trial court's decision to terminate the Parents' parental rights is supported by clear and convincing evidence.

FACTS AND PROCEDURAL HISTORY

Mother and Father are the parents of twins, A.W. and P.W., born March 1, 2003; N.W., born May 6, 2004; M.W., born May 26, 2009; and C.H., born October 7, 2011.[1]

On April 29, 2011, the Vanderburgh County Department of Child Services (DCS) received a report that the Children had missed forty-one days of school, thirty of which

---

[1] Father is the biological father of A.W., P.W., N.W., and M.W., and is the alleged father of C.H.

2

were unexcused absences.[2] It was also reported "that the [C]hildren's clothes are always dirty and they have a recurring problem of head lice." (DCS Ex. 2-A).

On May 18, 2011, a DCS family case manager visited the family's home and observed

> a strong odor of rotting food, body odor, and garbage. The home had no electricity and very little food. There were dirty dishes piled up, mold growing in the fridge, clothing piled up with clean and dirty clothing in the same piles, and flies and gnats throughout the home. All four [C]hildren, including the [two] year old, were all sharing one mattress.

(DCS Ex. 2-A). Additionally, Father stated that he had been using illegal substances, including methamphetamines, marijuana, and "wet" (a marijuana joint dipped in PCP and formaldehyde). The Children had not visited a doctor, the Parents were not treating the Children's lice, and the Children had to bathe at a family friend's home. That same day, DCS removed the four Children from the Parents' custody and placed them in a foster home. At this time, Mother was nineteen weeks pregnant with C.H.

On May 25, 2011, the trial court declared each of the four oldest Children to be a Child in Need of Services (CHINS). Over the next six months, Parents complied with their court-mandated parental participation plans. In addition to working with a homemaker parent aide (Parent Aide), the Parents remained drug free, moved into a more suitable apartment, maintained working utilities, acquired appropriate bedding for each Child, and were seeking housing that was large enough to accommodate the entire

---

[2] A.W., P.W., and N.W. were the only school-aged Children at the time DCS became involved.

family.  Based on the improvement, on October 28, 2011—just twenty-one days after the birth of C.H.—DCS returned the four oldest Children to the Parents for a trial home visit.

The Children remained with the Parents for nearly three months.  Then, on January 27, 2012, after two Children were sent home from school for lice, DCS made a home visit and observed that Father was supervising the Children while Mother was out getting a perm.  Father, who appeared sluggish and had glassy eyes, admitted that "he thought that the case was closing so he 'relaxed' and smoked some 'weed.'" (DCS Ex. 2-A).  During DCS's visit, C.H. sat in his swing, crying and left unattended.  There were several other unidentified adults in the home, as well as a twelve-year-old boy who stated that he had spent the night partying and playing videogames with Father and that they had smoked marijuana.  The "Children stated that the adults stayed overnights and used their bunks, forcing the four older girls to sleep in one bunk together, [Father] on one bunk and [Mother] on the couch.  Multiple adults came to the door during the home visit." (DCS Ex. 2-A).  Three days later, on January 31, 2012, DCS removed the Children from the Parents and, because there were no friends or relatives who could care for the Children, returned them to foster care.  On February 2, 2012, the trial court declared C.H. to be a CHINS.

Following the Children's second removal, DCS resumed the Parents' services and supervised visitation.  In February of 2012, the Children began contracting head lice following each visit with the Parents.  The problem persisted to the point that DCS had to cancel visitation until the Parents and the Children were all lice-free.  DCS also ordered

4

the Parents to be cleared by the Health Department prior to visits. The Parents were angry about the required lice inspections, and they frequently refused to be checked, resulting in many missed visits. The lice-visitation pattern continued through the end of July of 2012, at which point the Children were refusing visits because they did not want to contract lice.

On February 28, 2012, Father admitted to being in contempt of court because he failed two random drug screens—testing positive for marijuana and K-2 (synthetic marijuana or spice), failed to appear for a drug screen, refused to complete a drug screen, and failed to attend substance abuse treatment. The trial court imposed a ninety-day sentence, which was held under advisement to give Father a chance to comply. Over the next month, Father failed to schedule his mandatory drug evaluation or attend treatment for substance abuse, missed visitation with the Children, and tested positive for alcohol.

On March 28, 2012, after finding the Parents were not in compliance with their case plan, the trial court approved a new permanency plan of reunification with a concurrent plan of termination of parental rights and adoption. On April 25, 2012, the trial court conducted a contempt hearing for both Mother and Father. Because Father had not complied with his substance abuse evaluation and treatment requirements, the trial court ordered him to serve four days of his suspended ninety-day sentence. The trial court found Mother was also in contempt because she had failed to maintain regular contact with DCS, had not secured appropriate living arrangements for the Children, and had not visited the Children in over a month. The trial court sentenced Mother to ninety-

5

days but suspended the sentence to provide her an opportunity to remedy her non-compliance. In May of 2012, the Parents moved into a bigger house. Mother worked part-time, and Father did not have steady employment, but they never submitted the requested documentation to DCS to show they could afford the home.

In August of 2012, the trial court suspended all visitation. On August 6, 2012, DCS filed a Petition to Terminate Parental Rights of both Mother and Father as to A.W., P.W., N.W., and M.W. On September 18, 2012, DCS filed a Petition to Terminate Parental Rights as to C.H. At this time, the Parents were two months delinquent in their rent, the home had serious roach and mold problems, and

> [The Parents] have not visited on a regular basis. [The Parents] both are unable to provide DCS proof that they are able to provide their five young [C]hildren a safe living environment. [Father] has not addressed his drug problem. Neither [Mother] nor [Father] had any form of communication with [DCS].

(DCS Ex. 2-B).

On November 12 and 13, 2012, the trial court conducted termination hearings. On January 30, 2013, the trial court entered its Finding of Facts and Conclusions of Law and granted DCS's petition to terminate the parental rights of Mother and Father.

The Parents now appeal. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

The Parents contend the trial court erred in terminating their parental rights. It is a long-standing principle that the Fourteenth Amendment of the United States Constitution protects a parent's fundamental interest in the upbringing of his or her children. *Bester v.*

*Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). The termination of parental rights is an extreme sanction, intended only for use as a last resort after the exhaustion of all other reasonable efforts. *In re D.B.*, 942 N.E.2d 867, 872 (Ind. Ct. App. 2011). "[W]hen parents are unable or unwilling to meet their parental responsibilities[,]" a court may terminate parental rights in order to protect the children. *Id.* at 871-72.

In reviewing a trial court's order to terminate parental rights, this court will not reweigh evidence or assess witness credibility, and we consider only the evidence and reasonable inferences therefrom that are favorable to the trial court's judgment. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). In this case, the trial court entered Finding of Facts and Conclusions of Law; therefore, we must determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* at 1229-30. We will uphold the trial court's findings and judgment unless clearly erroneous. *Id.* at 1229.

"A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence." Ind. Code § 31-37-14-2. In order to terminate parental rights, DCS must prove:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

7

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). In this case, the Parents contend that there is no clear and convincing evidence supporting the trial court's finding of a reasonable probability that the conditions which resulted in the Children's removal will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Children's well-being.[3]

I. *Reasonable Probability of Remedying Conditions*

In finding a reasonable probability that the conditions resulting in a child's removal will not be remedied, a trial court is required to evaluate "a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009). To assess the parent's fitness, a trial court may examine a "parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* (emphasis omitted). As evidence of a parent's habitual conduct, the trial court may properly consider the parent's history of criminal activity, drug and alcohol use, neglect, failure to support, and failure to maintain adequate housing and employment, as well as the parent's compliance with DCS services. *Id.* The evidence need not eliminate all possibilities of change; rather, the trial court must find evidence sufficient to demonstrate a "reasonable probability the parent's behavior will not change." *Id.*

---

[3] The Parents do not challenge the sufficiency of the evidence establishing that termination of parental rights is in the Children's best interest and that there is a satisfactory plan in place for the care and treatment of the Children. I.C. § 31-35-2-4(b)(2)(C)-(D).

In this case, the trial court concluded there is a reasonable probability that the reasons for the Children's removal and continued placement in foster care will not be remedied, stating,

> [N]othing suggest[s] that these [P]arents can consistently provide a safe, secure, stable and caring environment. By the [P]arents allowing these conditions in the first place is tragic. By the [C]hildren repeatedly having head lice and smelling so bad that they are ridiculed at school shows a total lack of parenting skills. After having the [S]tate's assistance and a tremendous amount of assistance from people who were simply good Samaritans[,] the [P]arents were given a second opportunity, but again failed. The underlying issues in this case have never been remedied as a lack of money, lack of caring, sporadic drug usage and lack of prioritizing the [C]hildren's needs are ongoing.

(Appellants' App. pp. 77-78). The trial court's relevant findings also included Father's lengthy history of criminal activity and substance abuse, including that between August of 2011 and June of 2012, Father failed to appear for seven drug tests, refused to submit to one drug screen, tested positive for drugs twice, and tested positive for alcohol once. Father also failed to complete his mandatory drug treatment as he was dismissed from the program for missing three sessions in ninety days. Thus, Father's failure to complete treatment established a likelihood that his substance abuse problems will reoccur. *See In re M.B.*, 666 N.E.2d 73, 78 (Ind. Ct. App. 1996), *trans. denied*.

In addition to the drug abuse, evidence demonstrates that the Parents have historically been unable to provide a safe and adequate environment for the Children. The Children had to be removed from the Parents not just once, but twice. As the trial court found, "[a]t the time of removal on May 18, 2011, the [P]arents' home . . . did not have electricity or running water, did not have appropriate bedding for the [C]hildren,

9

and was in a state of repair that made it unsafe for the [C]hildren." (Appellants' App. p. 73). Even with the financial and personal assistance of DCS and family friends, the Parents were unable to maintain a clean and stable residence to keep their Children home for more than three months. The removal on January 31, 2012 was due to Father's ongoing drug use, as well as the Parents' continued failure to attend to the Children's basic needs. Specifically, the record reflects that days before the second removal, DCS observed Father making C.H. a bottle of 2% milk because he claimed they could not afford baby formula. Despite a lack of funds to provide their baby with basic nourishment, however, Mother was out having her hair permed and buying fried chicken for Father. Along with the lack of appropriate food and shelter, there is also evidence that the Parents have consistently disregarded the Children's hygiene, health, and medical needs. The trial court found that

> [the Children] were sent home from school numerous times throughout the 2010-2011 school year for having lice while in the care of their [P]arents. The [C]hildren were often observed by school personnel as being unclean with body odor and wearing dirty clothing. [P.W.] didn't wear socks to school even though several packages had been bought by the school and sent home with her. Her feet smelled so bad that they had to be soaked in baking soda to remove the smell. [P.W.] was often ridiculed at school by her peers for being unclean. The school offered to pay for doing the laundry and sent shampoo home, but the problems persisted. The [C]hildren's hygiene improved greatly when they were placed in foster care, but worsened during the trial home visit. Since the latest removal the school social worker no longer has to check on the [C]hildren on a daily basis.

(Appellants' App. p. 87). Also, in October of 2011, C.H.'s doctor informed Mother that it was important for C.H. to have an echocardiogram to confirm the existence of a heart

10

murmur. Despite the family's receipt of Medicaid assistance, the Parents never scheduled the appointment, and the procedure was left to the foster family to attend to.

The Parents, however, argue that the Children's Court Appointed Special Advocate (CASA) and the Parent Aide testified during the termination hearing that the Parents had obtained housing and had made several repairs, which supports an improvement in their housing conditions and should, therefore, contradict the trial court's finding. In its findings, the trial court did note that the Parent Aide assisted with resources for housing, utilities, and appliances; however, the trial court also found that the Parents' reported improvements were insufficient. Even a year-and-a-half after the Children were removed because of an unsafe house, the Parents had not made the minimum changes necessary to make the house safe. Furthermore, testimony of the CASA and the Parent Aide supports the trial court's determination by demonstrating the Parents' inability to act *independently* in order to remedy conditions and maintain those changes. According to the CASA:

> I felt that the [P]arents made progress when someone was working with them. If there was someone specific to do something I felt that they did it. But if they were left on their own to do it, it didn't happen. For instance, the refrigerator that Homebuilders had procured for them, all it had to do was be picked up and it was never . . . that never happened. They went for about a two month period without a refrigerator because they didn't go to pick it up. There were a lot of things that just fell off. They promised, yes they had a house, yes they were gonna move. It never happened. [Father] would say yes he had a job, he was working, you never saw proof that it ever happened.

(Tr. p. 87). If the Parents could not even maintain a suitable home for the Children while wholly relying on the assistance of others, there is no basis to expect that the conditions will somehow improve when the Parents no longer have DCS's full support.

Second, the Parents argue that they had secured adequate housing and electricity by the time of the termination hearings and that Mother had an income sufficient to support the family. As this court has previously found, "the time for parents to rehabilitate themselves is during the CHINS process, *prior* to the filing of the petition for termination. The termination statutes do not require the court to give a parent additional time to meet his or her obligations." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007). In this case, the Parents had a year-and-a-half to remedy the conditions, and despite numerous opportunities, the Parents "always ha[d] some excuse to not be interested." (DCS Ex.2-A (statement of the CASA)). They did "just enough to keep the case moving. There [was] always action right before court but nothing in between." (DCS Ex.2-A (statement of the CASA)). The Parents' eleventh-hour efforts might have made a greater impact if the record was not replete with other missed opportunities by the Parents to demonstrate an ability to remedy the conditions. Such inaction reflects "an extreme ambivalence on [the Parents'] part, and a severe unwillingness to modify [their] behavior so as to provide [the Children] with a safe and secure home life." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1253 (Ind. Ct. App. 2002), *trans. denied*.

Lastly, the Parents argue that "[t]he trial court made many additional Findings of Fact but their probative value is not sufficient to justify the termination of parental rights." (Appellants' Br. p. 10). It is well-established that the trial court has full discretion in assigning the probative value of evidence. *See In re J.S.*, 906 N.E.2d 226, 231, 235 (Ind. Ct. App. 2009). Here, the trial court entered numerous findings, which the Parents have not contested, to provide support for its ultimate conclusion. Thus, we find that sufficient evidence exists to support the trial court's determination, and it is not the role of this court to reweigh evidence merely because it may be more favorable to the Parents' position. *See id.* Accordingly, we find clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability that the conditions will not be remedied.[4]

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's order to terminate the Parents' parental rights to the Children.

Affirmed.

ROBB, C. J. and KIRSCH, J. concur

---

[4] Because we find that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement outside of the home will not be remedied, we need not address whether there is sufficient evidence to support the finding that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See K.T.K.*, 989 N.E.2d at 1234.